**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NICK TINKLE, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br> v.<br><br>JECTNYC, LLC,<br><br>       Defendant. | **Case No. 1:25-cv-01238**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nick Tinkle ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

**NATURE OF ACTION**

1. This is a class action lawsuit brought against JECTNYC, LLC ("JECT" or "Defendant") on behalf of all persons who have visited the website jectnyc.com (the "Website") and booked an appointment for wrinkle reducers, fillers, Aquagold®, skin resurfacing & light treatments, PRP & PRFM[1] skin and hair rejuvenations, and cortisone injections (each, a "Treatment" and collectively, the "Treatments").

2. When booking medical treatment online, patient privacy is crucial. Patients expect, as they should, that their private information will be held in confidence and not shared with third parties. The sensitive nature of information related to the Treatments amplifies the need for privacy during online bookings, as these procedures often involve sensitive details of a

---

[1] Platelet-rich plasma ("PRP") and platelet-rich fibrin matrix ("PRFM") both blood treatments that use platelets to promote healing and tissue regeneration.

patent's individual appearance and body image.  Such information can be emotionally charged and stigmatizing, making the protection of such data critical.

3.      Defendant owns and operates the Website, where patients can book appointments for Treatments at one of its brick-and-mortar medical facilities.

**Figure 1:**



4.      Through the Website, Defendant's patients are able to book an array of injectable and medical-grade Treatments, as listed above.

5.      Unbeknownst to Plaintiff and members of the putative class, and contrary to Defendant's duties as a medical provider, Defendant discloses its patients' individually identifiable health information ("IIHI") to third parties, including Meta Platforms, Inc. ("Meta") and Google, LLC ("Google") for targeted advertising purposes.  Plaintiff brings this action for legal and equitable remedies resulting from Defendant's illegal actions.

## THE PARTIES

6.      At all relevant times, Plaintiff was a resident of Long Island City, New York and maintained an active Facebook account.  Plaintiff has been a patient of JECT since 2022 and has made multiple appointments for medical procedures through its Website.  Plaintiff created his

account with JECT in 2022.  While in New York, Plaintiff booked multiple appointments for wrinkle reducer injections, including as recently as March 2023 after logging into his patient account.  Unbeknownst to Plaintiff, Defendant disclosed his IIHI—including the fact that he was booking an appointment for injections—to Meta and Google for targeted advertising purposes.  After booking an appointment on Defendant's Website, Plaintiff began receiving targeted advertisements for similar products and services.  Plaintiff's offsite activity report from his Facebook account confirms that Defendant disclosed his data to Meta.  Plaintiff would not have booked an appointment on the Website if he knew Defendant was violating his privacy by sharing his personal and medical/injectable treatment information with unknown third parties.

7.    Defendant is a New York limited liability company with its principal place of business in New York, New York.  Defendant owns and operates a professional network of brick-and-mortar medical clinics that specialize in injectable and medical-grade cosmetic treatments.  Botox treatment is recognized as a medical procedure in New York.[2]  Defendant also develops, owns, and operates the Website, which is used by consumers throughout New York City, Los Angeles, Miami, Westchester, the Hamptons, and Palm Beach to book appointments for injectable and medical-grade cosmetic treatments.  Defendant chose to embed tracking technologies on its Website, whereby it shared the confidential medical information of its patients with Meta and Google for targeted advertising purposes.  Defendant did this without authorization or consent from its patients.

---

[2]https://dos.ny.gov/system/files/documents/2024/05/beauty_salon_0.pdf#:~:text=Such%20servic es%20are%20the%20practice,by%20a%20licensed%20medical%20professional.&text=Licensed %20cosmetologists%20and%20estheticians%20may,regulated%20by%20New%20York%20Stat e ("All appearance enhancement licensees are prohibited from providing injections of any substance, such as ***Botox***, Restylane ***or other fillers***[.] ***Such services are the practice of medicine and should only be provided by a licensed medical professional***.") (emphasis added).

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 because it arises under a law of the United States (the Electronic Communications Privacy

Act, 18 U.S.C. § 2511). Further, this action is a putative class action, and Plaintiff alleges that at

least 100 people comprise the proposed class, that the combined claims of the proposed class

members exceed $5,000,000 exclusive of interest and costs, and that at least one member of

the proposed class is a citizen of a state different from at least one defendant.

9.      This Court has personal jurisdiction over Defendant because Defendant conducts

substantial business within this District.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial

part of the events giving rise to this claim occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.      Health-Related Information is Sensitive and Confidential

11.     Defendant assisted Meta and Google, two of the largest technology companies in

the world, with intercepting information that is sensitive, confidential, and personally

identifiable.

12.     Under federal law, a healthcare provider may not disclose personally identifiable

information ("PII") or protected health information ("PHI") without the patient's express written

authorization.[3]  In this case, PHI includes but is not limited to information pertaining to

Treatment appointments.

13.     The United States Department of Health and Human Services ("HHS") has

established a national standard, known as the HIPAA Privacy Rule, to explain the duties

---

[3] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[4]

14.     A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[5]

15.     The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity…and the individual obtained or disclosed such information without authorization." *Id*.

16.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to its patients.

17.     Defendant further failed to comply with other HIPAA safeguard regulations as follows:

    a.     Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

    b.     Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

---

[4] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[5] 42 U.S.C. § 1320d-6.

c.   Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

d.   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

e.   Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

f.   Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

18.   Entities regulated under HIPAA, like Defendant, may use third-party tracking tools in a limited way to perform analysis on data key to operations.  They are not permitted, however, to use these tools in a way that may expose patients' PHI to vendors (as shown below in Figures 2 through 3).  As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.  **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.**[6]

---

[6] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (THE "BULLETIN") (EMPHASIS ADDED), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

19.    The Bulletin discusses the types of harm that disclosure may cause to the patient:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others.  For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.  Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[7]

20.    Plaintiff and Class Members face exactly the risks about which the government expresses concern.  Defendant's unlawful conduct resulted in third parties intercepting information regarding Plaintiff and Class Members booking appointments for Treatments when logged into their account on Defendant's Website.

21.    The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, **or any unique identifying code**.[8]

22.    Crucially, that paragraph in the government's Bulletin continues:

All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, **such as IP address**

---

[7] *Id.* (emphasis added).

[8] *Id.* (emphasis added).

or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus **relates to the individual's past, present, or future health or health care** or payment for care.[9]

23.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director.  "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130

---

[9] *Id.* (emphasis added).

[regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, **medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment**.[10]

24.    Therefore, Defendant's conduct, as described more thoroughly below, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

**B.    The Facebook Tracking Pixel**

25.    Facebook, owned by Meta, describes itself as a "real identity platform,"[11] meaning users are allowed only one account and must share "the name they go by in everyday life."[12] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[13]

---

[10] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking. (emphasis added).

[11] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[12] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[13] FACEBOOK, SIGN UP, https://www.facebook.com.

26.     Meta sells advertising space by highlighting its ability to target users.[14]  Meta can target users so effectively because it surveils user activity both on and off its sites.[15]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[16]  Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[17]

27.     Advertisers can also build "Custom Audiences."[18]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[19]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[20]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Meta's "Business Tools."[21]

---

[14] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[15] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[16] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[17] https://www.facebook.com/business/news/Core-Audiences.

[18] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[19] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[20] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[21] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494;

28.    As Meta puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[22] Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

29.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[23] Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[24] Advertisers can even create their own tracking parameters by building a "custom event."[25]

30.    One such Business Tool is the Facebook Pixel (the "Facebook Pixel"). Meta offers this piece of code to advertisers, like Defendant, to integrate into their websites. The

---

FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[22] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.
[23] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED,
https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST
PRACTICES FOR META PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142;
FACEBOOK, META for DEVELOPERS - APP EVENTS API,
https://developers.facebook.com/docs/marketing-api/app-event-api/.
[24] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[25] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also*
FACEBOOK, META for DEVELOPERS: MARKETING API – APP EVENTS API,
https://developers.facebook.com/docs/marketing-api/app-event-api/.

Facebook Pixel "tracks the people and type of actions they take."[26]  When a user accesses a website hosting the Facebook Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers.  This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

31.    Each time Defendant sent this activity data, it also disclosed a patient's personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Meta admits as much on its website.  Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

32.    A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

33.    The Meta Pixel is designed to collect information about website visitors that can be matched to an individual's Facebook profile for the purpose of sending targeted advertising to that user.

---

[26] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

34.     When the Facebook Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, the Facebook Pixel involves Meta, a separate and distinct third-party entity from the parties in the conversation, using the Facebook Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Meta itself is collecting the content of any conversation. That information is then analyzed by Meta before being provided to any entity that was a party to the conversation (like Defendant).

35.     Once Meta intercepts website communications, it has the capability to use such information for its own purposes. In 2021, Meta generated over $117 billion in revenue.[27] With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[28] Meta sells advertising space by highlighting its ability to target users by including them in the Core Audiences and Custom Audiences offered to its clients.[29]

36.     In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that Meta can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing Meta to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new Meta Business Tools products and services, or improve pre-existing Meta Business Tools products and services.

---

[27] FACEBOOK, META ANNUAL REPORT 2021, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.
[28] *Id.* at 63.
[29] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

37.    One of Meta's partners is Defendant.  The Facebook Pixel is employed on the Website in the manner described throughout this Complaint.

**C.    Google's Advertising Technology**

38.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g. Chrome, Safari, Edge, etc.).

39.    Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

40.    Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

HTTP Request: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from devices to the host server.  Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request.  HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

41.    A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or

loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

42.     Every website is comprised of Markup and "Source Code."  Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

43.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  The tracking technologies embedded on the Website by Defendant constitute Source Code and function is a substantially similar way.

44.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

45.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[30]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Figure 2:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|--------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

---

[30] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

46.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

47.     One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

48.     Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

49.     In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

50.     Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in

advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

51.    Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[31]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[32]

52.    Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when JECT users are logged into their account portals.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

53.    In other words, when interacting with the Website, an HTTP Request is sent to JECT's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google's tracking technologies.

---

[31] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/

[32] *Id.*

54.     Thus, Defendant is essentially handing its patients a tapped device, and once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties like Google.

55.     Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

56.     After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

57.     In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

58.     Google Analytics links with Google Ads so that Google may use the data intercepted by Google Analytics to be utilized for targeted advertising purposes.[33]  Such practices were in effect on the JECT Website at all relevant times.

59.     The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI.  Google received at least "Custom Events" and URLs that disclosed the botox treatment being received by the patient. Google also received additional PII, including the patients' IP address, device information, and User-IDs.

60.     For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the JECT Website.

61.     In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

62.     These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

63.     As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[34]

---

[33] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article

[34] https://www.blog.google/products/chrome/building-a-more-private-web/

64.     The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[35]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

65.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[36]

66.     Browser-fingerprints are personal identifiers.  Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

67.     As enabled by Defendant, Google collects vast quantities of consumer data through its tracking technology.

68.     Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

69.     Google then utilizes such information through targeted advertising.

**D.     Defendant Violates the Privacy Rights of its Patients**

42.     Injectables are medical procedures surging in popularity.

43.     Defendant allows its patients to book appointments through its Website to schedule Treatments.

---

[35] https://www.pixelprivacy.com/resources/browser-fingerprinting/

[36] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

44. Unbeknownst to its patients, Defendant embedded Meta and Google's tracking technologies on its Website, including after patients have logged into their accounts or "patient portals."

45. To begin, patients log in to their patient accounts:

**Figures 3-4:**





46.     After signing into their account, patients can book Treatments at any of the

medical facilities operated by Defendant:

**Figures 5-6:**





47. Patients then finalize their appointment by selecting the time of their treatment:

**Figures 7-8:**





48.     Similar data is intercepted by Meta, which allows it to determine that Plaintiff and Class Members booked a medical appointment at one of Defendant's clinics:

**Figure 9:**

49.     Defendant shares its patients' PII and PHI with its advertising partners, Meta and Google. The information shared by Defendant allows Meta and Google to know the identities of

specific individuals as well as information related to the specific Treatments they are receiving. This allows these companies, including Defendant, to profit from this information it collects from its patients for targeted advertising purposes.

50.     For example, when a patient books an appointment for botox, Defendant assists Meta and Google in intercepting the information related to their appointment, including the specific Treatment they are booking an appointment for and whether the patient is signed into their patient account, as shown below in Figures 3-9:

51.     Defendant further assists Meta and Google by disclosing the PII of its patients sufficient for Meta and Google to uncover their identities.  In both HTTP and HTTPS communications, like Figures 4, 6, 8, and 9, the patient's IP address is inherently included in every network request.  In addition to its patients' IP addresses, Defendant, through Meta and Google's tracking technologies, disclosed information about their specific devices, and User-IDs to Meta and Google, allowing Meta and Google to link such information to an individual's specific identity.

52.     As shown above, Plaintiff's communications with Defendant were disclosed by Defendant to Meta and Google and/or intercepted in transit by Meta and Google, in real time, via detailed URLs, which contain medically sensitive information and personally identifiable information entered into the Website.

53.     Defendant sent these identifiers with each patient's "event" data.

54.     When patients share their personal information with medical professionals, they expect this information to be kept confidential.  Moreover, when consumers seek a specific treatment from medical professionals, they also expect this highly sensitive information to be kept confidential.

55.     If patients knew that Defendant was sharing their personal information for targeted advertising purposes, they would go to one of its competitors instead who do not engage in the practice of surreptitiously collecting and disclosing its patients' information.  Through the above-listed third-party tracking services, which Defendant used via the software code installed, integrated and embedded into the Website, Defendant disclosed its patients' identities and sensitive medical information.

56.     By installing, integrating and embedding the above-listed tracking technologies into the Website, and by directing such installation, integration and embedding, Defendant aided and conspired with the third parties and others to allow those third-party entities to contemporaneously and surreptitiously intercept the Website communications of Defendant's patients without the patients' consent.

57.     Defendant engages in this deceptive conduct for its own profit at the expense of its patients.  Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal law.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action on behalf of all persons in the United States who booked an appointment for a Treatment on jectnyc.com (the "Class").

59.     Excluded from the Class is Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or had a controlling interest.

60.     Plaintiff is a member of the Class he seeks to represent.

61.    The Class is so numerous that joinder of all members is impractical.  Although Plaintiff does not yet know the exact size of the Class, it is believed that there are at least thousands of Class members.

62.    The Class is ascertainable because the Class members can be identified by objective criteria – all individuals who booked an appointment on the Website.  Individual notice can be provided to Class members "who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

63.    There are numerous questions of law and fact common to the Class, which predominate over any individual actions or issues, including but not limited to:

A.    Whether Defendant gave the Class members a reasonable expectation of privacy that their information was not being shared with third parties;

B.    Whether Defendant's disclosure of information constitutes a violation of the claims asserted;

C.    Whether Plaintiff and Class members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

D.    Whether Plaintiff and Class members have sustained damages as a result of Defendant's conduct and if so, what is the appropriate measure of damages or restitution.

64.    Plaintiff's claims are typical of the claims of the members of the Class, as all members are similarly affected by Defendant's wrongful conduct.  Plaintiff has no interests antagonistic to the interests of the other members of the Class.  Plaintiff and all members of the Class have sustained economic injury arising out of Defendant's violations of common and statutory law as alleged herein.

65.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

66.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

67.     Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1), *et seq.***

68.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

69.     Plaintiff brings this claim individually and on behalf of members of the Class.

70.     The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

71.     The ECPA protects both sending and the receipt of communications.

72.     18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

73.     The transmission of Plaintiff's PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

74.     The transmission of PII and PHI between Plaintiff and Class members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

75.     The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

76.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

77.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

78.    The following instruments constitute "devices" within the meaning of the ECPA:

a.    The computer codes and programs Defendant, Meta, and Google used to track Plaintiff and Class members communications while they were navigating the Website;

b.    Plaintiff's and Class members' browsers;

c.    Plaintiff's and Class members' mobile devices;

d.    Defendant, Meta, and Google's web and ad servers;

e.    The plan Defendant, Meta, and Google carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they were using a web browser to navigate the Website.

79.    Plaintiff's and Class members' interactions with Defendant's Website are electronic communications under the ECPA.

80.    By utilizing and embedding the tracking technology provided by Google and Meta on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

81.     Specifically, Defendant intercepted—in real time—Plaintiff's and Class members' electronic communications via the tracking technology provided by Meta and Google on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to third parties, including but not limited to Meta and Google.

82.     Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class members regarding PII and PHI, including their identities and information related to appointments for Treatments.  This confidential information is then monetized for targeted advertising purposes and revenue generation, among other things.

83.     By intentionally disclosing or endeavoring to disclose Plaintiff's and Class members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

84.     By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

85.     Defendant intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

86.     The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[37]

87.     Plaintiff's information that Defendant disclosed to Meta and Google qualifies as IIHI, and Defendant violated Plaintiff's and Class members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used the electronic communications to increase its profit margins.  Defendant specifically used the tracking technology provided by Meta and Google to track and utilize Plaintiff's and Class members' PII and PHI for financial gain.

88.     Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

89.     Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy.  Plaintiff and Class members, all of whom are patients of Defendant, had a reasonable expectation that

---

[37] 42 U.S.C. § 1320d-6.

Defendant would not redirect their communications to Meta and/or Google without their knowledge or consent.

90.     The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

91.     As a result of each and every violation thereof, individually and on behalf of the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

## COUNT II
### Negligence

92.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

93.     Plaintiff brings this claim individually and on behalf of members of the Class.

94.     Upon accepting, storing and controlling the PHI and PII of Plaintiff and the Class, Defendant owed—and continues to owe—a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive PHI and PII.

95.     Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PHI and PII from unauthorized disclosure.

96.     It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PHI and PII through its use of the tracking technology would result in unauthorized third parties—such as Google—gaining unlawful access to such information.

97.    Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' PHI and PII arose due to the special relationship that existed between Defendant and its patients, which is recognized by statute and common law.

98.    Defendant had an additional, separate duty under the FTC Act to not disclose its patients' PII and PHI.

99.    Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their PHI and PII.  Defendant's misconduct included the failure to: (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate Website and event monitoring and (iv) implement the systems, policies and procedures necessary to prevent unauthorized disclosures resulting from the use of the tracking technology implemented by Defendant.

100.    As a direct result of Defendant's actions, including but not limited to the disclosure of Plaintiff's and Class Members' PHI and PII, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, and emotional distress.

101.    Defendant's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted (and continues to constitute) negligence at common law.

102.    Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

## COUNT III
### Invasion of Privacy

103.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

104.    Plaintiff brings this claim individually and on behalf of members of the Class.

105.    The highly sensitive and personal information of Plaintiff and Class Members consists of private and confidential facts and information regarding Plaintiff's and Class Members' medical treatments that were never intended to be shared beyond private communications on the Website and the consideration of health professionals.

106.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their PHI and PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties, including but not limited to Google.

107.    Defendant owed a duty to Plaintiff and Class Members to keep their PHI and PII confidential.

108.    Defendant's unauthorized disclosure of Plaintiff's and Class Members' PHI and PII to Google, a third-party technology and marketing giant, is highly offensive to a reasonable person.

109.    Defendant's willful and intentional disclosure of Plaintiff's and Class Members' PHI and PII constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

110.    Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Google's simultaneous eavesdropping and wiretapping of confidential communications.

111.    Defendant failed to protect Plaintiff's and Class Members' PHI and PII and acted knowingly when they installed the tracking technology onto the Website because the purpose of said technology is to track and disseminate users' communications on the Website for marketing and advertising.

112.    Because Defendant intentionally and willfully incorporated the tracking technology onto the Website and encouraged individuals to use and interact with the Website and the services thereon, Defendant had notice and knew that its practices would cause injury to Plaintiff and the Class.

113.    As a proximate result of Defendant's acts and omissions, the PII and PHI of Plaintiff and Class Members was disclosed to unauthorized third parties, causing Plaintiff and the Class to suffer damages.

114.    Plaintiff, on behalf of himself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, lost benefit of the bargain and pre-judgment interest and costs.

115.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PHI and PII is still maintained by Defendant and still in the possession of unauthorized third parties, and the wrongful disclosure of this information cannot be undone.

116.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's and unauthorized third parties' continued possession of their sensitive and confidential information.  A judgment for monetary damages will not undo Defendant's

disclosure of the information to unauthorized third parties who, upon information and belief, continue to possess and utilize the information.

117.    Plaintiff, on behalf of himself and Class Members, further seeks injunctive relief to enjoin Defendant from intruding into the privacy and confidentiality of Plaintiff's and Class Members' PHI and PII and to adhere to its common law, contractual, statutory and regulatory duties.

## COUNT IV
### Breach of Implied Contract

118.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

119.    Plaintiff brings this claim individually and on behalf of members of the Class.

120.    Defendant required Plaintiff and Class Members to provide their private information, including their computer IP addresses, appointment information, and other content submitted to or obtained by Defendant's Website as a condition of their receiving medical services.

121.    When Plaintiff and Class Members provided their data to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their PHI and PII without consent.

122.    Plaintiff and Class Members accepted Defendant's offers and provided their PHI and PII to Defendant.

123.    Plaintiff and Class Members fully performed their obligations under the contract with Defendant.

124.    Defendant breached this agreement, which directly and/or proximately caused Plaintiff and Class Members to suffer damages, including nominal damages.

125.    Plaintiff and Class Members would not have entrusted Defendant with their PHI and PII in the absence of an implied contract between them and Defendant obligating Defendant not to disclose this information without consent.

126.    Defendant breached this implied contract by disclosing Plaintiff's and Class Members' PHI and PII to a third party like Google.

127.    As a direct and proximate result of Defendant's breaches of this implied contract, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services had they known their private information would be disclosed.

128.    Plaintiff and Class Members are entitled to compensatory and consequential damages because of Defendant's breach of implied contract.

## COUNT V
## Breach of Fiduciary Duty

129.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

130.    Plaintiff brings this claim individually and on behalf of members of the Class.

131.    A relationship existed between Plaintiff and Class Members on the one hand and Defendant on the other in which Plaintiff and Class Members put their trust in Defendant to protect their PHI and PII, and Defendant accepted that trust.

132.    Defendant breached the fiduciary duty that it owed to Plaintiff and Class Members by failing to act with the utmost good faith, fairness and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, the PHI and PII of Plaintiff and Class Members.

133.    Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

134.    But for Defendant's breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

135.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

136.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential and/or nominal damages, injunctive relief, and all other relief allowed by law.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action;

b.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c.    For an order declaring that Defendant's conduct violates the statutes referenced herein;

d.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e.    Award compensatory damages, including statutory damages where available, to Plaintiff and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.    Ordering Defendant to disgorge revenues and profits wrongfully obtained;

g.    For prejudgment interest on all amounts awarded;

h.    For injunctive relief ordering Defendant to immediately cease its illegal conduct;

i.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

j.    Grant Plaintiff and the Class members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated: June 11, 2025                    Respectfully submitted,


By: */s/ Alec M. Leslie*
    Alec M. Leslie

**BURSOR & FISHER, P.A.**
Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 2100
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiff*